**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 19 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LAZARO ALEXANDER
HERNANDEZ,

    Defendant - Appellant.

No. 01-8051

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 00-CR-118-B)**

---

G. Mark Garrison, Garrison & Bronnenberg, P.C., Cody, Wyoming, for
Defendant-Appellant.

James C. Murphy, Assistant United States Attorney (James Allison, Assistant
United States Attorney, and Sean Connelly, Assistant United States Attorney, on
the brief), Denver, Colorado, for Plaintiff-Appellee.

---

Before **EBEL**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **O'BRIEN**,
Circuit Judge.

---

**EBEL**, Circuit Judge.

On March 26, 2001, a jury convicted Lazaro Alexander Hernandez

("Defendant") on one count of possession of a firearm by a prohibited person in

violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  On appeal to this Court, Defendant argues that his Fifth and Sixth Amendment rights were violated when a recused Assistant United States Attorney sent two e-mails to his son, who was married to Defendant's sister, regarding Defendant's case.  Defendant also argues that the district court erred when, pursuant to the recorded recollection exception to the hearsay rule, it admitted hearsay testimony linking Defendant to the gun that he was convicted of possessing.  The person with firsthand knowledge of the fact in dispute orally conveyed that information to two people who recorded it, and both the speaker and the people who recorded the information testified at trial that they performed their roles accurately.  We hold that Defendant's constitutional claims lack merit and that the district court did not abuse its discretion by admitting the hearsay testimony under Federal Rule of Evidence 803(5).  Accordingly, we AFFIRM Defendant's conviction.

## BACKGROUND

On July 3, 1999, Defendant attended his nephew **Alex**'s birthday party at the Cheyenne, Wyoming home of his sister **Connie Hernandez**.  Also attending the party was **Shane Crofts**, an Army officer who was Connie Hernandez's boyfriend and the father of Alex.  Shane lived in Brighton, Colorado.  During the party, Defendant asked Shane if he could smoke a cigarette in Shane's car.  Shane

agreed and gave Defendant his car keys, which Defendant returned when he was finished. Later that day, Shane noticed that his garage door opener, which he usually kept in his car, was missing. The opener was found a few days later in Connie's side yard in a place that had previously been searched.

When Shane returned to his house in Brighton, Colorado the next morning, he discovered that all of his firearms, as well as other items, had been stolen from the top shelf of his bedroom closet. One of the stolen firearms was a Beretta 9 millimeter semiautomatic pistol that Shane's father, **Christopher ("Kip") Crofts**, had given to him. Kip Crofts was an Assistant U.S. Attorney for the District of Wyoming. There were no signs of forced entry at Shane's home, although someone could have come into the house from the garage because the door between the garage and the house was routinely kept unlocked.

About a month later, Defendant asked two friends, **Kirk and Tracy Allen**, to store a gun for him at their house. Defendant told them this was necessary because another sister with whom he was living, **Vina Renee Hernandez** ("Renee"), would not allow a gun to be kept in her home. Defendant brought the gun to the Allens' house in a black duffel bag, and when the Allens moved into a trailer, Defendant transported the gun to the Allens' new residence.[1] After

---

[1]Defendant disputes that he brought this gun to the Allens.

leaving the gun in the Allens' trailer for about a week, Defendant retrieved it and carried it away in the same black duffel bag.

At one point during that summer, Tracy Allen mentioned to Defendant's sister Renee Hernandez that Defendant was storing a gun at their house. Renee Hernandez asked her for the gun's serial number, but Tracy Allen initially refused to give it to her. Instead, Tracy Allen called another friend, **Jacqueline Grant**, and recited the serial number to her so that Jacqueline Grant could record it. When Renee Hernandez called Tracy Allen back several days later to ask again for the serial number, Defendant had already taken back the gun, so Tracy Allen called Jacqueline Grant for the serial number. After Jacqueline Grant told Tracy Allen the number, Tracy Allen called Renee Hernandez and recited the number to her over the phone. Renee Hernandez then wrote the number down.

Shortly before Christmas 1999, a friend of Defendant came to Renee Hernandez's house and dropped off a black duffel bag. Inside the duffel bag were the Beretta 9 millimeter firearm and some of Defendant's personal possessions. The duffel bag and Defendant's personal possessions contained therein were positively identified as Defendant's by his former live-in girlfriend, **Elizabeth Fanning**. Renee Hernandez gave the duffel bag and its contents, including the gun, to Shane Crofts, who then turned them over to federal authorities.

On July 20, 2000, Defendant was indicted in the United States District Court for the District of Wyoming on a single count of possession of a firearm (the Beretta) by a prohibited person, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

In November of 2000, Connie Hernandez logged onto Shane Crofts's computer using his password and discovered two e-mails to Shane from his father, Kip Crofts, the Assistant U.S. Attorney in Wyoming. The first e-mail was dated June 30, 2000, during the period that Defendant was under investigation by the federal government but before he was charged. In the message, Kip told Shane he was concerned about Connie's refusal to cooperate with **Ken Bray**, the Alcohol, Tobacco and Firearms agent investigating Defendant's case; Kip warned Shane what could happen to Connie if she did not cooperate.[2] The second e-mail was

---

[2] The June 30 e-mail stated, in relevant part:

"Ken Bray called me today; they are going to present that case to the July Grand Jury. He said he has tried several more times to arrange to talk to Connie through that police officer, but she has never contacted him. If she doesn't she's going to get a grand jury subpoena. I have tried to stay out of this case, but I am worried about her. I'm afraid she thinks if she just ignores it, or refuses to talk to them, she won't have to get involved, and the reality is very much otherwise. This is an extremely serious situation. If she gets a subpoena she has to appear, and if she doesn't they'll arrest her. It is simply not her choice at this point. If she comes in to the GJ via the subpoena, but refuses to talk, they'll threaten her with contempt of court, and she could go to jail until she cooperates, which could be two months, until the next GJ session. Naturally, I'd hate to see the mother of my grandchild put through all that. The best thing for her would be to just get

(continued...)

dated November 14, 2000. In it, Kip told Shane that the defense investigator working on Defendant's case, **Steve Brinkerhoff**, had told him that Defendant was the "biggest jerk he's ever worked with."[3] Connie Hernandez turned copies of both messages over to defense counsel. In light of the second message, which implied a conflict on the defense team because of the apparent disdain that the defense investigator had for Defendant, Defendant's counsel filed a motion to withdraw and a motion to substitute counsel. On November 16, 2000, the district court held a hearing on the matter, granted counsel's motion to withdraw, and appointed private attorney **Daniel Blythe** as new counsel pursuant to the Criminal Justice Act.

Blythe filed a motion to dismiss the indictment and for further relief, citing prejudice from the November 14 e-mail about the defense investigator's poor opinion of Defendant and arguing that the June 30 e-mail was an attempt by the

---

[2](...continued)
ahold of Ken and tell him everything she knows immediately. . . . She can't fight this, and she can't ignore it, and I'd like to find some way to explain that to her before she gets into something she can't handle."

[3] The November 14 e-mail stated, in relevant part:

"Shaner: I'll try to get ahold of you by phone, but in case I don't, Ken Bray [an ATF agent] needs you to call him ASAP. Trial of Alex [Hernandez] may be Nov 27. He had apparently signed a plea agreement, then backed out at last minute. (Not for repeat, Public Defender Investigator, a good guy, says he's the biggest jerk he's ever worked with — that from a guy who's been dealing with criminals for 25 years.)"

government to coerce Connie Hernandez into testifying against Defendant, her brother. The same day, Defendant filed a pro se motion to dismiss the indictment, arguing that his right to a speedy trial had been violated, citing prejudice from his former defense counsel's conflict of interest, and indicating that his new counsel was ineffective.

The government responded to the motion for dismissal and further relief by noting that (1) both Kip Crofts and the entire U.S. Attorney's Office for the District of Wyoming had recused themselves from the case and prosecution of this case had been transferred to the U.S. Attorney's Office for the District of Colorado; hence, there could be no "government" action implicated in Kip's e-mails; (2) neither of Kip's e-mails had been directed to Connie Hernandez, and they only communicated true and accurate information from Kip to his son Shane about the risk to Connie of choosing not to testify before a grand jury, so they could not be construed as threats to a witness; and (3) Defendant suffered no prejudice from the e-mails. The government argued that if Defendant no longer trusted his counsel, that situation was created by his own perceptions rather than by any government misconduct, and in any event, Defendant had been given new counsel. Nor, said the government, had it obtained any advantage, evidence or information about Defendant's defense from Kip's communications with Shane.

The district court provisionally denied all defense motions and later affirmed that ruling after Connie Hernandez and Defendant testified outside the jury's presence. The trial ended in a hung jury, and the court declared a mistrial. Prior to jury selection in the second trial, the district court again denied all of Defendant's pretrial motions, including his motion to dismiss.[4] At the second trial, the jury found Defendant guilty. The court sentenced him to 80 months in prison to be served concurrently with a pre-existing state term, as well as three years of supervised release and a monetary assessment of $100. Defendant timely appealed.

**DISCUSSION**

## I. DEFENDANT'S E-MAIL-RELATED CHALLENGES

We exercise jurisdiction pursuant to 28 U.S.C. § 1291. We review factual findings under the clearly erroneous standard; we review de novo the ultimate constitutional issue. United States v. Johnson, 4 F.3d 904, 910 (10th Cir. 1993).

Defendant challenges his conviction on five grounds stemming from the two e-mails from Kip Crofts to Shane Crofts that were intercepted by Connie Hernandez: (1) that Kip Crofts's June 30 e-mail to Shane Crofts, urging Shane to

---

[4]For the second trial, Judge Brimmer replaced Judge Johnson, who was dealing with an illness in the family.

persuade Connie Hernandez to cooperate in the investigation of Defendant, constituted an attempt to intimidate Connie Hernandez in violation of his Fifth Amendment due process rights; (2) that the November 14 e-mail, which revealed that Kip Crofts and the defense investigator had spoken, thereby demonstrated improper contact between the government and the defense that violated Defendant's Fifth and Sixth Amendment rights; (3) that the negative remarks attributed to the defense investigator in the November 14 e-mail proved the existence of a conflict of interest within the defense team that violated Defendant's Fifth and Sixth Amendment rights; (4) that the district court erred by failing to hold a hearing to investigate further the e-mail incidents; and (5) that Defendant's second appointed counsel was ineffective for failing to address sufficiently the previous four issues. We address and reject each of these claims in turn.

### A.  Whether the June 30 e-mail was an unconstitutional attempt to intimidate Connie Hernandez

Defendant's claim on this point fails for three reasons. First, Kip Crofts (and indeed the entire U.S. Attorney's office for the District of Wyoming) had already recused himself from Defendant's case by the time he sent the June 30 e-

mail to Shane.[5]  Because Kip Crofts was not acting in his governmental capacity—but rather, as the e-mail indicates, in his capacity as a concerned father and grandfather[6]—his actions cannot be attributed to the government and thus cannot be said to have violated Defendant's constitutional rights.

Second, there is no evidence, other than Defendant's interpretation of the e-mail, that Kip Crofts intended to intimidate Connie Hernandez, and no evidence

---

[5]Although the date of Kip Crofts's recusal is not stated in the record, it appears to have occurred before Kip Crofts sent the June 30 e-mail, which refers to "the AUSA from Denver who is handling [Defendant's case]."  If Kip Crofts and the Wyoming U.S. Attorney's office had not already been recused, that reference would make no sense.  The specific reference to the AUSA is to James Allison, the assistant U.S. attorney for the District of Colorado who prosecuted Defendant and is one of the attorneys from that office handling the instant appeal.

Bolstering our conclusion that Kip Crofts and the Wyoming U.S. Attorney's office had already recused themselves by the time the June 30 e-mail was sent is the following statement from the district court:

So there was a recognition that [the relationship between Kip Crofts and Defendant] poses a problem, there's a conflict by those relationships. United States Attorney's Office here in Cheyenne recused itself, and that's to say we cannot prosecute this case.  And the matter was reported to the Attorney General of the United States, Janet Reno, and her office responded by asking that another attorney from another district come in as a special prosecutor in this case and asked the nearest United States Attorney's Office in Denver, Colorado to take on that task and the duties there.

Finally, the Government's brief implies that the recusal occurred early in the investigation of this case, and Defendant does not allege otherwise.

[6]In the e-mail, Kip said, "I have tried to stay out of this case, but I am worried about her . . . .  Naturally I'd hate to see the mother of my grandchild put through all that."

whatever that she changed her testimony after reading the e-mail. While Connie testified at trial that she felt "very intimidated" when she read the e-mail, she also said that reading it did not change her testimony or her cooperation with defense counsel in any way. The only harm she articulated was that she had "lost a lot of trust in our judicial system." While that is unfortunate, it does not amount to a violation of her brother's constitutional rights.

Third, even if the e-mail was an attempt by Kip Crofts to intimidate Connie Hernandez, it does not rise to the level of prosecutorial misconduct warranting reversal. Prosecutorial misconduct entitles a defendant to relief only if the misconduct "infected the trial to such an extent that it resulted in a fundamentally unfair trial." Fox v. Ward, 200 F.3d 1286, 1299 (10th Cir. 2000) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 645 (1974)). Because Connie testified that reading the e-mail did not change her testimony, Defendant cannot reasonably argue that Kip's sending the e-mail rendered his trial fundamentally unfair. Accordingly, we reject Defendant's challenge to his conviction on this basis.

### B. Whether the November 14 e-mail revealed improper contact between the prosecution and the defense that violated Defendant's Sixth Amendment rights

The November 14 e-mail revealed that Kip Crofts, as Assistant U.S. Attorney in the recused U.S. Attorney's office for the District of Wyoming, had a

conversation with defense investigator Steve Brinkerhoff of the Federal Public Defender's office. Defendant argues that this constituted an invasion of the attorney-client relationship between him and his defense counsel (an Assistant Federal Public Defender) that violated his Fifth Amendment right to due process and his Sixth Amendment right to counsel. As a result, he asked the court to dismiss his indictment. We decline to do so, as we find no violation of Defendant's constitutional rights.

Where a litigant challenges governmental action under the Due Process Clause and under another, more specific constitutional provision, we analyze the claim under the latter, more specific provision. See, e.g., Bateman v. City of West Bountiful, 89 F.3d 704, 709 (10th Cir. 1996) (analyzing a claim under the Takings Clause rather than the Due Process or Equal Protection Clauses); Graham v. Connor, 490 U.S. 386, 395 (1989) (analyzing a claim of excessive force by the police under the Fourth Amendment rather than under "the more generalized notion of 'substantive due process'"). Because the allegedly improper contact in this case took place after Defendant was indicted and counsel was appointed, we analyze Defendant's challenge to that contact under the more specific Sixth Amendment right to counsel, rather than the more generalized notion of Fifth Amendment due process.

We reject Defendant's Sixth Amendment challenge to the contact between Kip Crofts and Brinkerhoff because we find that Kip Crofts's actions cannot be attributed to the state. See generally Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288 (2001) (discussing the state action requirement). Kip Crofts and the entire U.S. Attorney's office for the District of Wyoming had recused themselves from Defendant's case prior to Defendant's indictment on July 20, 2000. At that point, Kip Crofts was no longer acting on behalf of the state with respect to Defendant's case. Therefore, any conversation that he subsequently had with defense investigator Brinkerhoff, while perhaps unadvisable, was not attributable to the state. Accordingly, we find that the contact between Kip Crofts and Brinkerhoff did not violate Defendant's Sixth Amendment right to counsel.

**C. Whether the negative opinion of Defendant held by the defense investigator as revealed in the November 14 e-mail demonstrated a conflict of interest within the defense team that violated Defendant's Sixth Amendment rights**

Defendant argues that the November 14 e-mail proved two things: 1) the existence of "an actual conflict of interest" within the defense team, and 2) that Brinkerhoff "violated the duty of loyalty, which is one of the paramount duties counsel owes to client." Defendant argues that "[u]nder these egregious circumstances, this Court must assume that Defendant was prejudiced by the collaborative actions of the Government and the defense team." Again, he bases

- 13 -

his argument on the Fifth and Sixth Amendments but does so imprecisely. Rather than untangle the knots in Defendant's argument, we will reject his claim for the simple reason that he has failed to show how Brinkerhoff's opinion of him prejudiced his case in any way. And for the reasons noted above, we will analyze his argument solely under the Sixth Amendment—the more specific constitutional provision in question here.

Although Defendant fails to specify what kind of Sixth Amendment claim he is raising here, it appears to be one of ineffective assistance of counsel. See Aplt. Br. at 24 ("Brinkerhoff, who was acting on behalf of Defense Counsel Barrett, violated the duty of loyalty, which is one of the paramount duties counsel owes to his client.") (citing Strickland v. Washington, 466 U.S. 668, 694 (1984)). Normally, we decline to review ineffective assistance of counsel claims on direct appeal. United States v. Galloway, 56 F.3d 1239, 1240 (10th Cir. 1995) (en banc). Only those "rare claims which are fully developed in the record may be brought... on direct appeal." Id. at 1242. We find that this ineffective assistance claim is sufficiently developed in the record to permit us to review it at this time.

To prove ineffective assistance of trial counsel, a defendant must satisfy the two-part test established by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). One, he must prove that his attorney's "performance was deficient" and "fell below an objective standard of reasonableness." Id. at

687-88. Two, he must prove that his counsel's deficient performance prejudiced him. Id. at 694. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id. at 697. We follow that course here.

Defendant's ineffective assistance claim fails for two reasons. First, any harm caused to Defendant by defense investigator Brinkerhoff's dislike of him was cured when, after the e-mails were disclosed by Connie Hernandez, Brinkerhoff and Defendant's trial counsel (of the Federal Public Defender's office) withdrew, and Defendant received new counsel, a private attorney appointed under the Criminal Justice Act. Second, Defendant has failed to allege even a single fact suggesting that Brinkerhoff's dislike of him negatively affected his case in any way. Cf. Hale v. Gibson, 227 F.3d 1298, 1313 (10th Cir. 2000) ("The fact that [trial counsel] did not like [his client] or did not trust him does not rise to the level of a conflict of interest. Personality conflicts are not conflicts of interest.") (citing Morris v. Slappy, 461 U.S. 1, 13 (1983)). Defendant does not, for example, argue that Brinkerhoff failed to pursue a particular line of investigation, or that he suppressed potentially exculpatory evidence, or anything of the kind. He merely states, without support, that "Brinkerhoff's statement to U.S. Attorney Crofts, disparaging [Defendant] could only have the effect of undermining his case and prejudicing him." Such an unsupported allegation,

without more, is insufficient to establish prejudice under <u>Strickland</u>.  <u>See</u> <u>Stafford</u> <u>v. Saffle</u>, 34 F.3d 1557, 1564–65 (10th Cir. 1994).

In sum, the November 14 e-mail suggests only that Brinkerhoff thought poorly of Defendant.  That does not, on the facts before us, amount to a violation of Defendant's constitutional rights.

### D.  Whether the district court should have held a hearing to investigate Defendant's allegations of governmental misconduct

Defendant argues that when confronted with the two e-mails, the district court erred by not conducting a hearing into whether those messages indicated a larger pattern of government interference with his case.  Because Defendant raises this argument for the first time on appeal, we review the district court's failure to conduct a hearing for plain error.  "Under this standard, reversal is warranted only when there is: (1) an error; (2) that is plain or obvious; (3) that affects substantial rights; and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings."  <u>United States v. James</u>, 257 F.3d 1173, 1182 (10th Cir. 2001) (citing <u>United States v. Hishaw</u>, 235 F.3d 565, 574 (10th Cir. 2000)).

We find that the district court did not err (much less plainly err) by failing to hold a hearing to investigate whether the e-mails indicated a larger pattern of government interference with Defendant's case.  As we have already discussed, Kip Crofts, who had recused himself from Defendant's case, cannot be considered

part of the government in this context; moreover, his two e-mails to Shane Crofts do not suggest that a pattern of malfeasance existed, and in fact the record affirmatively suggests that these e-mails were isolated, special circumstances, with no adverse impact upon Defendant's ability to mount a defense. It was thus not error for the district court to forgo a hearing on the matter.

> **E. Whether Defendant received ineffective assistance of counsel when his second counsel failed to pursue his misconduct/conflict-of-interest issues pertaining to these e-mails**

Defendant argues that his second lawyer, Daniel Blythe, was constitutionally ineffective for failing "to zealously present the misconduct/conflict of interest issues to the District Court." As noted above, however, there is no merit to the underlying claims and thus Defendant's second counsel could not have been ineffective for failing to pursue those claims. Thus, we reject this ineffectiveness claim.

## II. WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION BY ALLOWING TWO HANDWRITTEN NOTES WITH THE SERIAL NUMBER OF THE GUN TO BE READ INTO THE RECORD UNDER THE RECORDED RECOLLECTION EXCEPTION TO THE HEARSAY RULE

"We review evidentiary rulings for abuse of discretion, and our review of decisions admitting statements contested as hearsay is especially deferential."

United States v. Edward J., 224 F.3d 1216, 1219 (10th Cir. 2000) (internal quotation marks and citation omitted).

Defendant argues that the district court improperly admitted hearsay testimony about the serial number of the gun he was charged with possessing. Specifically, he claims that the exhibits read into the record containing the serial number of the gun did not satisfy the requirements of the recorded recollection exception to the hearsay rule because they were not "made" by a single witness or "adopted" by a single witness. See Fed. R. Evid. 803(5). The serial number evidence was important because it was recorded from the gun Defendant asked Tracy Allen to store for him, thereby providing direct evidence that Defendant possessed the gun at issue. We conclude that the district court did not abuse its discretion and that the evidence was properly admitted under Rule 803(5).

At trial, Tracy Allen was asked if she could remember the serial number of the gun that she said Defendant stored at her home. She said that she could not. She did, however, testify that she had accurately recited the serial number to two people—Jacqueline Grant and Renee Hernandez—who themselves testified that they accurately wrote down the serial number. The chain of events was as follows: Renee Hernandez heard that Defendant was keeping a gun at Tracy Allen's house. Renee Hernandez then called Tracy Allen to ask for the serial number of the gun. Tracy Allen refused to give it to her. After that conversation,

Tracy Allen called Jacqueline Grant and asked her to write down the serial number, which Tracy Allen read off the gun, which was in front of her. Jacqueline Grant wrote down the number. Renee later called Tracy Allen a second time, again asking her for the serial number. At that point, Tracy Allen agreed to give it to her. But by this time, the gun was no longer at Tracy Allen's home, so she did not have the serial number in her possession. Therefore, Tracy Allen called Jacqueline Grant and asked Grant to recite the serial number back to her. Jacqueline Grant agreed and read the number to Tracy Allen. Tracy Allen then called back Renee Hernandez and recited the serial number to her. Renee Hernandez wrote down the serial number as Tracy Allen was saying it. At no time after these phone conversations did Tracy Allen examine the writings made by Jacqueline Grant and Renee Hernandez.

Tracy Allen, Jacqueline Grant, and Renee Hernandez all testified at trial that they performed their roles accurately. Tracy Allen testified that she accurately read the serial number from the gun to Jacqueline Grant, and that she later recited it accurately to Renee Hernandez. Jacqueline Grant testified that she accurately wrote down the serial number when Tracy Allen recited it to her, and that she accurately read the serial number back to Tracy Allen pursuant to Allen's subsequent request. Renee Hernandez testified that she accurately wrote down the serial number when Tracy Allen recited it to her. The notes made by

Jacqueline Grant and Renee Hernandez were read into the record but not themselves introduced as evidence.

Defendant objected, asserting that the notes were hearsay that did not fit within the 803(5) exception. He argued that because the statements read to the jury were the joint product of Tracy Allen, Jacqueline Grant and Renee Hernandez, they were not admissible under the hearsay exception for past recollection recorded. The district court overruled the objection. We conclude that the hearsay testimony did fit within the Rule 803(5) hearsay exception and that the district court's ruling was correct.

Rule 803(5) is the exception to the hearsay rule for recorded recollections. It states:

> **Recorded Recollection.** A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, <u>shown to have been made or adopted by the witness when the matter was fresh in the witness' memory</u> and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

Fed. R. Evid. 803(5) (emphasis added).

The most logical reading of the phrase "by the witness" is that that phrase modifies both of the preceding verbs "made" and "adopted." As explained in one leading treatise:

A somewhat different type of cooperative report is involved when one person orally reports facts to another person, who writes them down. A store clerk or timekeeper, for example, may report information to a bookkeeper. In this situation, courts have held the written statement admissible if the person reporting the facts testifies to the correctness of the oral report (although at the time of the testimony, the detailed facts cannot be remembered) and the recorder of that statement testifies to faithfully transcribing the oral report. While subject to some ambiguity because of inartful drafting by Congress, the Federal Rule continues to permit admission of such multi-party statements.

2 <u>McCormick On Evidence</u> § 283, at 247 (John W. Strong ed., 5th ed. 1999) (footnotes omitted). The authors of the <u>McCormick</u> treatise base their reading of the rule in part on the Senate committee report commenting on a change to the rule:

> The committee does not view the House amendment [adding the words "or adopted by the witness"] as precluding admissibility in situations in which multiple participants were involved.
> When the verifying witness has not prepared the report, but merely examined it and found it accurate, he has adopted the report, and it is therefore admissible. <u>The rule should also be interpreted to cover other situations involving multiple participants, e.g., . . . information being passed along a chain of persons</u> . . . .

S. Rep. No. 93-1277 (1974), <u>reprinted in</u> 1974 U.S.C.C.A.N. 7051, 7074 (emphasis added).

The issue of the admissibility of recorded recollections constructed by more than one person has not appeared with frequency in the case law. Nevertheless, at least two circuits have suggested that a past recollection is admissible where it is the product of an oral report of facts by one witness to another who writes them

- 21 -

down.  See United States v. Schoenborn, 4 F.3d 1424, 1427–28 (7th Cir. 1993) ("Where a person perceives an event and reports it to another person who records the statement, both must ordinarily testify to establish that the statement is a past recollection recorded under Rule 803(5).  The person who witnessed the event must testify to the accuracy of his oral report to the person who recorded the statement.  The recorder must also testify to the accuracy of his transcription."); United States v. Booz, 451 F.2d 719, 725 (3d Cir. 1971) (analyzing the common-law version of 803(5) prior to the adoption of the Federal Rules of Evidence) ("Some courts and textwriters have taken the view that where as here, a record is the joint product of two individuals, one who makes an oral statement and one who embodies it in a writing, if both parties are available to testify at trial as to the accuracy with which each performed his role, the recollection may be admitted. . . . We think such an exception to the hearsay rule is sound and adopt it here.") (citations omitted).  Prominent treatises also endorse this reading of Rule 803(5).  See, e.g., 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 803.07[3][d], at 803–53 (Joseph M. McLaughlin ed., 2d ed. 2002) ("So long as accuracy is vouched for by each participant in the chain, a memorandum compiled through the efforts of more than two persons may be admitted."); 30B Michael H. Graham, Federal Practice & Procedure, § 7046, at 380 (interim ed. 2000) ("Multiple person involvement in the process of

observation and recording is permitted, though on this point the rule is less clear than might be desired.").

No Tenth Circuit case has squarely addressed this issue. There is, however, dicta in this circuit that indirectly suggests support for this interpretation of Rule 803(5). In Chaney v. Brown, 730 F.2d 1334, 1354 n.26 (10th Cir. 1984), we considered the recorded recollection exception as it existed under the common law. In that case, the court said that the contents of an FBI report would be admissible under the hearsay exception for recorded recollection when the report contained facts observed by a witness and written down by an agent. "'If [the FBI agent] can verify the accuracy of his transcription and if [the witness] can testify he related an accurate recollection of the number to [the agent], we believe that, even though [the witness] may not have read the report, sufficient indicia of its accuracy exist to let the evidence go to the jury.'" Id. (quoting Booz, 451 F.2d at 725) (alterations in original). Although Chaney was not a direct interpretation of Rule 803(5), its reasoning is the same as that used by courts and commentators analyzing the federal rule.

These readings are consistent with the purpose of the hearsay rule and the reasons why there are exceptions to that rule. The purpose of the hearsay rule is to preclude a class of evidence considered to be generally less reliable than in-person testimony of events observed by the testifying witness. 2 McCormick,

- 23 -

supra, § 245, at 93–96. The exceptions to the general rule excluding hearsay "recognize numerous [instances] where circumstantial guarantees of trustworthiness justify" acceptance of a hearsay statement as evidence of the truth of the matter asserted. Id. § 253, at 126 (internal quotation marks omitted). Recollections recorded through the efforts of more than one person under Rule 803(5) possess such circumstantial guarantees of trustworthiness. Such recollections have sufficient indicia of accuracy to be admitted in evidence when the parties who jointly constructed the record testify that, on the one hand, the facts contained in the record were observed and reported accurately, and on the other hand, that the report was accurately transcribed.

We hold that a recorded recollection compiled through the efforts of more than one witness is admissible under Rule 803(5), where, as here, each participant in the chain testifies at trial as to the accuracy of his or her piece of the chain. Therefore, the district court properly admitted the serial number records of Jacqueline Grant and Renee Hernandez. Jacqueline Grant's statement is admissible because Tracy Allen testified that she accurately read the serial number off the gun to Jacqueline Grant, and Jacqueline Grant testified that she accurately recorded it. The serial number that Renee Hernandez recorded is also admissible, although in the case of her record there is an extra link in the chain between the observation of the number by Tracy Allen and Renee Hernandez's

- 24 -

recording of it: Tracy Allen read the number to Jacqueline Grant, Jacqueline Grant read the number back to Tracy Allen (who at that point no longer had the gun), and Tracy Allen recited the number to Renee Hernandez. But again, each witness testified that the transfer and recording of the information at each step of the chain occurred accurately. That testimony constitutes sufficient indicia of reliability to bring the recorded serial number within the ambit of Rule 803(5).

Therefore, the district court did not abuse its discretion in admitting the evidence of the serial number, and we affirm its decision to do so.

## CONCLUSION

For the foregoing reasons, Defendant's conviction is AFFIRMED.