FILED
United States Court of Appeals
Tenth Circuit

October 3, 2024

Christopher M. Wolpert
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

　　　Plaintiff - Appellee,

v.                                                                    No. 23-5091

ELGA EUGENE HARPER,

　　　Defendant - Appellant.

_____

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 4:22-CR-00170-SJM-1)**

_____

Jami Johnson, Assistant Federal Public Defender (Jon M. Sands, Federal Public Defender with her on the brief), Phoenix, Arizona, for Defendant – Appellant.

Leena Alam, Assistant U.S. Attorney (Clinton J. Johnson, U.S. Attorney, with her on the brief), Tulsa, Oklahoma, for Plaintiff – Appellee.

_____

Before **BACHARACH**, **MORITZ**, and **FEDERICO**, Circuit Judges.

_____

**FEDERICO**, Circuit Judge.

_____

　　　Elga Eugene Harper was tried before a jury and convicted of kidnapping

and assaulting a single victim, E.F., in Indian country. The indictment,

predicated on federal jurisdiction, alleged Harper is an Indian as defined under federal law. Harper was sentenced to life in prison and judgment was entered on July 27, 2023. Harper timely appealed and now raises four issues.

Harper argues that the district court erred by: (1) admitting a hearsay verification letter from the Choctaw Nation of Oklahoma to prove Harper's Indian status as it was inadmissible hearsay and not a business record; (2) excluding the expert testimony of Dr. Geoffrey Loftus on the issue of trauma and memory; (3) permitting the Government's forensic nurse to provide unnoticed expert testimony regarding the science of trauma and memory without expertise; and (4) failing to properly instruct the jury regarding kidnapping and asportation of the victim.

We have jurisdiction under 28 U.S.C. § 1291. Finding merit in the first issue on appeal, we reverse the convictions and sentence and remand for the district court to vacate the judgment and conduct further proceedings.

## I

Harper was tried and convicted by a jury of kidnapping and sexually assaulting a 72-year-old semi-retired Episcopal nun in her home in Tulsa, Oklahoma. The victim, E.F., testified that she met Harper in 2021 when he asked if he could cut the grass in her yard. E.F. continued to hire Harper to make small repairs to her home because he needed work. Due to his unhoused

status, E.F. and her neighbors would allow him into their homes to use the phone or restroom.

A few months before the sexual assault, E.F. hired Harper to repair a light fixture in her home, but he was unable to complete the task the same day and left. On the following Tuesday, Harper returned to E.F.'s home; however, E.F. informed Harper that he could not make the repairs in her home that night because she was teaching a class that evening and needed to prepare. E.F. testified that Harper became angry and stated that he needed to complete the task. E.F. and Harper argued about the date he was supposed to have returned, E.F. paid Harper for the work he previously performed, and Harper "stormed out." R.IIIA at 470–71.

On May 2, 2022, Harper returned to E.F.'s house at approximately 10:00 or 10:30 p.m. E.F. testified that Harper acted cheerful and as if the two had not argued. That evening, Harper asked E.F. to be his counselor; however, E.F. declined because they did not "get off to a good start" and Harper subsequently left. *Id.* at 471–72.

On May 4, 2022, at approximately 2:00 p.m., Harper returned to E.F.'s home, asked if she had any work for him, and requested to use the bathroom. E.F. informed Harper that she did not have any work for him but let him inside to use the bathroom. Soon after entering E.F.'s home, Harper attacked her, fashioned a noose out of a cord, placed the noose around her neck, and dragged

her around the house. Over the next four hours, Harper tied E.F. up, sexually assaulted her multiple times, dropped her on her head and neck when moving her into the bathroom, and forced her to shower in scalding hot water. Due to being in shock, E.F. was temporarily paralyzed from her injuries. Harper moved E.F. to her bedroom where he proceeded to beat her while bound and ransacked her home for her vehicle's keys and title. Harper left E.F.'s home at around 6:00 p.m. E.F. testified that Harper picked up his shorts from the floor, but she did not see what else he was wearing when he left.

After Harper left, E.F. proceeded to call 911. She described the assault, her injuries, and identified her attacker as "Elga Harper." Supp. R.III at 5–6. E.F. identified Harper as Black during the 911 call.

After leaving E.F.'s home at around 6 p.m., Harper traveled to another neighbor's home wearing shorts and a purple robe. The neighbor permitted Harper to shower, shave, and wash his clothes at his house. Harper stayed at the neighbor's home for four hours before being asked to leave because he was acting nervous and jittery. The next morning—on May 5, 2022—the neighbor was approached by police officers at his home. He told police that he had noticed unfamiliar bags in the back of his truck, which he then retrieved and provided to the police. Police recovered a backpack that contained Harper's social security card, E.F.'s business card, a hand-written note that stated "[c]heck into how I can get [illegible] help for glasses from the tribe," and a

4

partially filled intake form from the Oklahoma City Indian Clinic. Supp. R.II at 9–10; R.III at 373–74, 491, 495. The police also recovered from the neighbor's trash can a set of electric clippers that the neighbor had given to Harper to shave, the purple robe that Harper was wearing when he arrived at the neighbor's home, and E.F.'s car keys.

## II

### A

Harper was arrested on May 10, 2022, and interviewed by police. Harper denied assaulting E.F. but admitted that he had entered her home and found her already bleeding and bound. Harper stated that he began to assist her by cutting her bindings and looking for her phone to call 911, but then got scared and left. Harper suggested that E.F. knew his name because he had worked for her and that there were "multiple gentlemen in the area that may or may not be of my size, of my color, of my race." Supp. R.II at 57, 59. On June 7, 2022, the Government indicted Harper, claiming federal jurisdiction and alleging that Harper is an Indian, as defined by federal law.

### B

Pretrial, the Government filed a motion to exclude the testimony of Harper's expert witness, Geoffrey Loftus, Ph.D. The defense proffered Dr. Loftus as an expert on eyewitness identification and how trauma may impact

memory when making an identification. On January 18, 2023, the district court granted the Government's motion.

The district court determined that Dr. Loftus's qualifications were uncontested. Citing *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123–26 (10th Cir. 2006), the district court noted that eyewitness identification expert testimony is admissible in "narrow" and "limited circumstances" such as "cross-racial identification, identification after a long delay, identification after observation under stress, and such psychological phenomena as the feedback factor and unconscious transference." R.I at 379. The district court determined that while the case "implicat[ed] cross-racial identification and identification after observation under stress, the identifications in this case were not made after a long delay." *Id*. The district court, relying upon *Rodriguez-Felix*, determined that "[t]his situation is more akin to an 'evidentiary cornucopia' of identification where expert testimony on memory and perception is not helpful." *Id*.

## C

Harper's trial commenced on February 6, 2023. At trial, the Government presented and attempted to lay the foundation to admit into evidence Exhibit 1, a letter from the Choctaw Nation of Oklahoma verifying Harper's Indian status. The letter was on the letterhead of "Choctaw Nation of Oklahoma CDIB/Trial Membership," dated January 18, 2023, and signed by Terry

Stephens, Director CDIB/Membership of the Choctaw Nation of Oklahoma. Supp. R.I at 2. The letter stated that Harper had a Certificate of Degree of Indian Blood (CDIB) issued by the Bureau of Indian Affairs in 2002 and, since 2011, was an enrolled member of the Choctaw Nation of Oklahoma. A form attached to the verification letter certified the authenticity of the letter as a "domestic business record[]." Supp. R.I at 3.

The Government elicited testimony from Tabitha Oakes, an employee at the Choctaw Nation of Oklahoma and manager of the CDIB and membership department. Oakes testified that she routinely prepares and oversees the certificates of enrollment—including researching Dawes records, birth records, and death records—to establish lineage and membership in the Choctaw Nation.

Oakes testified that the CDIB is issued by the Bureau of Indian Affairs, that an individual must have a CDIB to be an enrolled member of the Choctaw Nation, and that the CDIB records are held in the Choctaw Nation's vault. Oakes noted that the enrollment records for the Choctaw Nation of Oklahoma are kept in the normal and ordinary course of business. Oakes recognized the Government's Exhibit 1 as (1) a verification letter by the Choctaw Nation of Oklahoma that was signed by Terry Stephens, the Director of CDIB/Membership, and (2) a Certificate of Authenticity that she prepared in her duties as an enrollment officer and that used the information and resources

7

of her department. At this point, the Government moved to admit and publish Exhibit 1 to the jury; however, Harper objected arguing a lack of foundation and hearsay. The district court summarily overruled Harper's objection and Exhibit 1 was admitted into evidence.

Following the admission of Exhibit 1 into evidence, Oakes testified that the verification letter pertained to Defendant Elga Eugene Harper, stated that Harper has a Certificate of Degree of Indian Blood, and confirmed that Harper is an enrolled member of the Choctaw Nation of Oklahoma with a membership number and issuance date. Harper declined to cross-examine Oakes. The signatory of the verification letter—Director Terry Stephens—did not testify. The district court then took judicial notice that the charged events occurred within Indian country, that the geographic area was not at issue, and that the factual question of whether the crime occurred in Indian country was established.

Later during the trial, the Government called Kathryn Bell—a recently retired forensic registered nurse of the Tulsa Police Department—as a witness to testify about the injuries sustained by E.F. During the redirect examination, Nurse Bell testified about the science of memory and memory formation after trauma. Harper objected, arguing that Bell was not "established as an expert on the area of memory and that the testimony was not sufficient to qualify her as an expert." R.III at 418. The district court concurred, but then asked Bell,

in the presence of the jury, "[i]s there anything in your description of memory that you just discussed that's relevant to the question of how [E.F.] remembered things closer to the event than she did perhaps when you interviewed her on the 17th of May?" *Id.*

The district court then permitted Bell to continue testifying on the process of memory formation and how memory is encoded by the amygdala. Again, Harper objected, noting that Bell did not have the expertise to give such testimony. The district court then noted that Harper could take up the issue during cross-examination and instructed the jury to weigh Bell's testimony as a "witness who does have some expertise study background and experience in these issues but you'll weigh her testimony as you do within the instructions I give you." *Id.* at 419. Harper proceeded to conduct recross-examination and elicited from Bell that she is not a doctor, psychologist, or head trauma surgeon and cannot give an opinion about E.F.'s memory.

**D**

At the close of the trial, the district court declined to include Harper's proposed language in the jury instruction regarding kidnapping and opted to use the Tenth Circuit's pattern jury instruction. The district court rejected a portion of Harper's jury instruction that stated:

> To qualify as a "kidnapping," there must be more than a transitory holding and more than a detention that occurs during and is inherent in the commission of a separate offense. To qualify as a

9

"kidnapping," a detention accompanying another crime must create a significant danger to the victim independent of that posed by the separate offense.

R.I at 404.

On February 9, 2023, Harper was convicted by the jury of four counts: kidnapping in Indian country, in violation of 18 U.S.C. §§ 1151, 1153, and 1201(a)(2); aggravated sexual abuse in Indian country, in violation of 18 U.S.C. §§ 1151, 1153, 2241(a); and two counts of assault in Indian country, in violation of 18 U.S.C. §§ 1151, 1153, and 113(a)(3), (a)(6). Judgment was entered on July 27, 2023, and Harper was sentenced to life in prison as to Counts One and Two and ten years as to Counts Three and Four, running concurrently. Harper now timely appeals.

**III**

Regarding the four arguments or claims of error made by Harper on appeal, we start first by setting out the standards of review we employ to consider and decide the issues before us. We then proceed to the merits of the claims, examining predominantly the first issue because it compels us to grant Harper relief.

**A**

Harper's first claim is that the district court erred by admitting into evidence Exhibit 1, the verification letter from the Choctaw Nation of Oklahoma offered to prove Mr. Harper's Indian status. Harper argues the

10

letter was inadmissible hearsay and does not fall under the "business record" hearsay exception. We agree.

**1**

We review legal interpretations of the Federal Rules of Evidence de novo while evidentiary decisions are reviewed for abuse of discretion. *United States v. Silva*, 889 F.3d 704, 709 (10th Cir. 2018). Because this claim involves a hearsay objection, "our review of decisions admitting statements contested as hearsay is especially deferential." *United States v. Hernandez*, 333 F.3d 1168, 1176 (10th Cir. 2003) (quoting *United States v. Edward J.*, 224 F.3d 1216, 1219 (10th Cir. 2000)). This Court is deferential to the district court because "hearsay determinations are particularly fact and case specific." *United States v. Channon*, 881 F.3d 806, 810 (10th Cir. 2018) (quoting *United States v. Hamilton*, 413 F.3d 1138, 1142 (10th Cir. 2005)).

Evidentiary rulings "may constitute an abuse of discretion only if based on an erroneous conclusion of law, a clearly erroneous finding of fact or a manifest error in judgment." *United States v. Keck*, 643 F.3d 789, 795 (10th Cir. 2011) (quoting *Webb v. ABF Freight Sys., Inc.*, 155 F.3d 1230, 1246 (10th Cir. 1998)). "Even if the court finds an erroneous evidentiary ruling, a new trial will be ordered 'only if the error prejudicially affects a substantial right of a party.'" *Id.* (quoting *Hinds v. Gen. Motors Corp.*, 988 F.2d 1039, 1049 (10th Cir. 1993)). "In conducting a harmless error review, we review the record *de novo*."

11

*United States v. Flanagan*, 34 F.3d 949, 955 (10th Cir. 1994). The Government

bears "the burden of proving that a non-constitutional error was harmless." *Id.*

**2**

Before diving into the hearsay analysis, we first detour to discuss and

consider the significance of Exhibit 1 as to the elements of the crimes charged.

That is, how and why Harper's status as an Indian is a jurisdictional predicate

to the entire case.

The General Crimes Act, 18 U.S.C. § 1151, et. seq., delineates which

crimes shall be within the exclusive jurisdiction of the United States and which

crimes shall be secured to the Indian tribes, respectively.[1] According to the Act,

Indian status is an essential element of offenses charged and not a mere

technicality. *See* 18 U.S.C. § 1152; *United States v. Simpkins*, 90 F.4th 1312,

1317–18 (10th Cir. 2024); *United States v. Langford*, 641 F.3d 1195, 1200 (10th

Cir. 2011). This Court has adopted a two-part test for determining whether a

case is within the exclusive jurisdiction of federal courts when committed by

an Indian in Indian country. *United States v. Prentiss*, 273 F.3d 1277, 1280

(10th Cir. 2001) (*Prentiss II*). In order for a criminal defendant to be subject to

---

[1] For a period of time, 18 U.S.C. § 1152 did not have a descriptive title. *See United States v. Walker*, 85 F.4th 973, 979 n.2 (10th Cir. 2023). It is now interchangeably referred to as the General Crimes Act, *see Oklahoma v. Castro-Huerta*, 597 U.S. 629, 638 (2022), or the Indian Country Crimes Act, *see Walker*, 85 F.4th at 979 n.2.

§ 1153, the fact finder "must make factual findings that the defendant '(1) has some Indian blood; and (2) is recognized as an Indian by a tribe or by the federal government.'" *Id.* (quoting *Scrivner v. Tansy*, 68 F.3d 1234, 1241 (10th Cir. 1995)). In this context, it was a question for the jury to make these findings. *United States v. Walker*, 85 F.4th 973, 982 (10th Cir. 2023). Ultimately, the burden falls on the Government to prove beyond a reasonable doubt Harper's Indian status. *United States v. Diaz*, 679 F.3d 1183, 1186 (10th Cir. 2012); *Prentiss*, 273 F.3d at 1283.

The Government attempted to meet its burden to prove Indian status by offering into evidence the verification letter through the testimony of the custodian, Oakes. Recall from above the verification letter was written shortly before trial and verified both that Harper had on file a CDIB and was a registered member of the tribe.

Generally, a CDIB is a self-authenticating domestic public document and does not require extrinsic evidence of authenticity in order to be admitted as evidence because it is issued by the U.S. Department of the Interior and bears its seal. *Walker*, 85 F.4th at 981–82. Conversely, a tribe's registration card or document bearing a tribal seal is not a self-authenticating domestic public document because it does not contain a seal of the United States or any state, district, commonwealth, territory, or insular possession of the United States.

Thus, extrinsic evidence of authenticity is required for a tribal card or document to be admitted. *Id.*

Here, the Government did not proffer as evidence Harper's CDIB to prove his Indian status. Instead, the Government proffered a letter of membership issued by the Choctaw Nation of Oklahoma certifying that Harper had a CDIB that was issued on January 2, 2002, and that he was a tribal member as of July 29, 2011. Accordingly, the Government was required to properly authenticate the verification letter and establish its admissibility under the Federal Rules of Evidence. Because the objection was to hearsay, the Government had to prove either the letter was not hearsay or that it fell within an exception to the hearsay rule.

While this appeal was pending, this Court revisited the issue of authentication of Indian tribal certificates and noted that Indian tribal certificates that include "the degree of Indian blood, or [that] membership in a tribe that will not accept members without a certain degree of consanguinity" satisfy the *Prentiss II* test. *United States v. Wood*, 109 F.4th 1253, 1257 (10th Cir. 2024) (quoting *Diaz*, 679 F.3d 1187). An Indian tribal certificate, however, is not admissible without authentication. *Id.* (citing Fed. R. Evid. 902(1), (2)). In *Wood*, we noted two routes for authentication:

> a proponent proceeding under Rule 803(6) must demonstrate a tribal record of an "act, event[, or] condition" (1) "was made at or near the time by—or from information transmitted by—someone

14

with knowledge"; (2) "was kept in the course [of the tribe's] regularly conducted activity"; and (3) "the making of the record was a regular practice of that activity." Fed. R. Evid. 803(6)(A)-(C). The proponent can make this showing through "the testimony of the custodian or another qualified witness, or by a certificate that complies with Rule 902(11)." Fed. R. Evid. 803(6)(D). To authenticate a tribal document under the Rule 902(11) certificate route, a proponent must give an opposing party reasonable pre-trial written notice sufficient to allow the opposing party "a fair opportunity to challenge" both the tribal record and certificate of authenticity. Fed. R. Evid. 902(11); *see also* Fed. R. Evid. 902 advisory committee's note to 2000 amendment (providing that this written notice requirement, which notice must be provided a reasonable time prior to trial, exists "to give the opponent of the evidence a full opportunity to test the adequacy of the foundation set forth in the declaration").

*Id.* at 1258 (footnote omitted).

**3**

Harper argues on appeal that the verification letter was inadmissible hearsay and not subject to any recognized exception within the Federal Rules of Evidence. Specifically, Harper argues that the letter was offered as evidence to prove the truth of the matter asserted—his Indian status. *See* Fed. R. Evid. 801(c). "Hearsay is not admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court." Fed. R. Evid. 802. Records of a regularly conducted activity, however, "are not excluded by the rule against hearsay." Fed. R. Evid. 803(6). Under this exception:

the proposed document must "(1) have been prepared in the normal course of business; (2) have been made at or near the time

15

of the events recorded; (3) be based on the personal knowledge of the entrant or of a person who had a business duty to transmit the information to the entrant; and (4) indicate the sources, methods and circumstances by which the record was made trustworthy."

*United States v. Rogers*, 556 F.3d 1130, 1136 (10th Cir. 2009) (quoting *United States v. Ary*, 518 F.3d 775, 786 (10th Cir. 2008)). Accordingly, the document will be admissible if:

> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

> Rule 902(11) echoes this requirement for self-authenticating evidence:

> The original or a copy of a domestic record *that meets the requirements of Rule 803(6)(A)-(C)*, as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record--and must make the record and certification available for inspection--so that the party has a fair opportunity to challenge them.

Fed. R. Evid. 902(11) (emphasis added). As we will address below, the record makes it clear that the Government did not properly establish the verification letter's foundation and trustworthiness under Rule 803(6). The Government did not address—either in its briefing or at oral argument—whether it gave

16

Harper reasonable notice of its intent to offer the verification letter or make it available for inspection, but neither did Harper raise lack of notice as an alternative claim of error.

Harper submits that the verification letter is not an original and cannot be admitted under the business records exception because (1) it was created less than three weeks before trial, (2) was not made at or near the time of the events recorded, (3) the author of the letter (i.e., Director Terry Stephens) was not made available to testify as to the creation of the verification letter, and (4) the letter was not kept in the ordinary course of business.

"An 'original' of a writing or recording means the writing or recording itself or any counterpart intended to have the same effect by the person who executed or issued it." Fed. R. Evid. 1001(d). "For electronically stored information, 'original' means any printout--or other output readable by sight-- if it accurately reflects the information." *Id.* "Copies" are "produced by methods possessing an accuracy which virtually eliminates the possibility of error," and as such "are given the status of originals." Fed. R. Evid. 1001(d) advisory committee's notes to 1972 proposed rules. "Copies subsequently produced manually, whether handwritten or typed, are not within the definition." *Id.* As such, we are not persuaded that this analysis turns upon whether the verification letter was an original or a copy because it is a completely different document than the CDIB.

17

That being said, "[n]ot every item of business correspondence constitutes a business record." *Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1091 (10th Cir. 2001). "It is well-established that one who prepares a document in anticipation of litigation is not acting in the regular course of business." *Id.* (quoting *Timberlake Const. Co. v. U.S. Fidelity & Guar. Co.*, 71 F.3d 335, 342 (10th Cir. 1995)). Such documents are "dripping with motivations to misrepresent." *Id.* (quoting *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 204 n.2 (4th Cir. 2000)). "The rationale behind the business records exception is that such documents have a high degree of reliability because businesses have incentives to keep accurate records." *United States v. Gwathney*, 465 F.3d 1133, 1140 (10th Cir. 2006) (quoting *Timberlake Const. Co.*, 71 F.3d at 341). They are accurate "because the information is part of a regularly conducted activity, kept by those trained in the habits of precision, and customarily checked for correctness, and because of the accuracy demanded in the conduct of the nation's business." *Timberlake Const. Co.*, 71 F.3d at 341 (quoting *United States v. Snyder*, 787 F.2d 1429, 1433–34 (10th Cir. 1986)). Consequently, "[i]f any person in the process is not acting in the regular course of business, then an essential link in the trustworthiness chain fails, just as it does when the person feeding the information does not have firsthand knowledge." *United States v. McIntyre*,

18

997 F.2d 687, 699 (10th Cir. 1993) (quoting 2 *McCormick on Evidence*, § 290 at 274 (John William Strong, ed., 4th ed. 1992)).

When introducing evidence under Rule 803(6), "courts generally assume that the business 'record' itself must be introduced, not solely testimony about the contents of a qualifying record." 30B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6868 (2024). To be admissible, a business record must "be based on the personal knowledge of the entrant or of a person who had a business duty to transmit the information to the entrant." *Rogers*, 556 F.3d at 1136 (quoting *Ary*, 518 F.3d at 786). "Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602. "The foundational requirement for personal knowledge 'is not difficult to meet.'" *United States v. Duran*, 941 F.3d 435, 448 (10th Cir. 2019) (quoting *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1132 (10th Cir. 2014)). "The district court considers only whether 'a rational juror could conclude based on a witness's testimony that he or she has personal knowledge of a fact.'" *Id.* (quoting *Gutierrez de Lopez*, 761 F.3d at 1132). "A court should exclude testimony for lack of personal knowledge 'only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to.'" *Walker*, 85 F.4th at 980–81 (quoting *Gutierrez de Lopez*, 761 F.3d at 1132).

Here, the Government attempted to cover its bases by including on the certificate of authenticity a declaration that the verification letter was a domestic business record and that the authentication satisfied both Rules 803(6) and 902(11). The Government counters that the district court did not abuse its discretion in admitting the verification letter because (1) the verification letter does not constitute inadmissible hearsay because it is derived from enrollment records kept in the normal and ordinary course of business per Rule 803(6), and (2) Oakes testified that (a) she had personal knowledge of the verification letter and the facts within it and (b) she personally prepared the certificate of authenticity that accompanied the verification letter.

Specifically, the Government argues, quoting *United States v. Channon*, 881 F.3d 806, 810–11 (10th Cir. 2018), that because the verification letter "reflected the information contained in the enrollment records, it qualified as an 'original' of the electronically stored information, and the fact that it was presented in a different form did not 'eliminate[] the business records exception.'" Resp. Br. at 33–34. According to the Government, the verification letter was created in the ordinary course of business and is an original because it "reflected the information contained in the enrollment records"; therefore, the Government argues that it did not need to provide the entirety of the Choctaw Nation's enrollment records or Harper's CDIB because it could

20

present the information in the form of a letter. *Id.* at 33. These arguments are unavailing for several reasons.

In *Channon*, the computer-generated records were spreadsheets containing OfficeMax records maintained by a third party, reflecting information in OfficeMax's electronic database of enrollment and transaction activity for fraudulent customer rewards accounts. 881 F.3d at 809. The data in the spreadsheets was machine-generated and voluminous. *Id.* at 811. This Court determined that machine-generated non-hearsay fell outside the purview of Federal Rule of Evidence 801 because the declarant was not a human and the data in the spreadsheets accurately reflected the information in the database. *Id.* Thus, we held that the spreadsheets were considered originals under Rule 1001(d).[2] *Id.* at 810. This Court further opined that the records would be admissible under Rule 803(6) because the records at issue were prepared and transferred by OfficeMax daily and not for the purpose of litigation. *Id.* at 811.

---

[2] Even if the verification letter was an original of electronically stored information, the Government would still be required to comply with Federal Rule of Evidence 1006 and "make the originals or duplicates available to the other party." *United States v. Channon*, 881 F.3d 806, 810 (10th Cir. 2018) (citing Fed. R. Evid. 1006). Presumably, that would still require the Government to produce the CDIB to the defendant before trial or produce the document in court.

Ultimately, the Government fails to persuade this Court that the Choctaw Nation of Oklahoma's tribal records were machine-generated and voluminous or that it could not present Harper's CDIB as evidence—nor can it make such an argument as prior caselaw establishes that the CDIB is self-authenticating. *See Walker*, 85 F.4th at 981–82. The Government also cannot establish that the verification letter was created in the regular course of business and not for the purpose of litigation. Indeed, the letter was issued on January 18, 2023, and the trial commenced on February 6, 2023. Nor did Oakes's testimony establish that the verification letter was a business record because her testimony was derivative of the letter itself, of which there was a preserved hearsay objection. Finally, Director Stephens was not present to testify at trial about the contents of the verification letter. At bottom, the district court abused its discretion in admitting the verification letter because the document was hearsay, not subject to any exception under the Federal Rules of Evidence, and not properly authenticated.

**4**

Having found the district court abused its discretion in admitting the verification letter into evidence, we next consider whether this error is harmless. "If a party objects to a district court's [evidentiary] ruling based solely on the Federal Rules of Evidence, we review for nonconstitutional harmless error." *Walker*, 85 F.4th at 982 (quoting *United States v. Ledford*, 443

22

F.3d 702, 707 (10th Cir. 2005)). The Government bears the burden of proving by a preponderance of the evidence that the substantial rights of the defendant were not affected. *Id.*; *see Flanagan*, 34 F.3d at 955.

The Government argues that Harper cannot show that he was prejudiced by the district court's abuse of discretion because (1) Harper does not suggest that his CDIB and enrollment information in the verification letter was false or questionable and (2) the evidence at trial included a partially completed medical history form from the Oklahoma City Indian Clinic and a page of handwritten notes referencing getting "help for glasses from the tribe." Resp. Br. at 35. The burden is upon the Government, not Harper, to prove Harper's Indian status beyond a reasonable doubt, and it is an essential element of each count of which he was convicted. *Prentiss*, 273 F.3d at 1283. The remaining evidence recovered in Harper's backpack does not satisfy *Prentiss II* because the form and notes do not establish that Harper has some Indian blood and is recognized as an Indian by a tribe or by the federal government. *Id.* at 1280. Accordingly, the Government's harmlessness arguments fail as a matter of law. Because the error applies to all four counts and negates an essential element in each count, the only proper remedy is for this Court to reverse the convictions because an element of each crime was not proved by legal and competent evidence beyond a reasonable doubt.

**B**

Because this Court reverses on the first issue, we decline to analyze in full the remaining arguments on appeal. However, we note two points about the other claims made by Harper in this appeal.

In his second claim, Harper argued the district court erred by excluding the expert testimony of Dr. Loftus, who was qualified to testify about the effect of trauma on the memory of eyewitnesses. More to the point, Harper argued the district court misread *Rodriguez-Felix* to convert "the narrow circumstances" it discusses that may lead to the admission of expert testimony about eyewitnesses into a multifactor test wherein the proponent must satisfy each element for the expert testimony to be admissible. 450 F.3d at 1124.

In *Rodriguez-Felix*, we rejected a per se rule excluding expert testimony on the reliability of eyewitness identifications. Rather, we acknowledged the circumstances that have been "held sufficient to support the introduction of expert testimony" on eyewitness identification "have varied," and we went on to explain those circumstances. *Id.* at 1124. Without examining the district court's analysis or deciding how *Rodriguez-Felix* applies to the prospective testimony of Dr. Loftus, we simply acknowledge it as a guidepost of controlling law and note that, on its face, the circumstances it mentions are not an exhaustive list or a line of hurdles that must all be cleared for the expert's testimony to be admissible.

In his fourth claim, Harper argues that the district court erred by relying upon our Pattern Criminal Jury Instruction § 2.55 for the federal offense of kidnapping. Subsequent to the trial, we decided *United States v. Murphy*, 100 F.4th 1184 (10th Cir. 2024). In *Murphy*, we held that "to sustain a kidnapping conviction under § 1201, the government must offer evidence showing that the defendant held the victim for an appreciable period of time." *Id.* at 1196. Our pattern jury instructions lag behind our decisions. We note that *Murphy*'s holding and analysis apply and should be incorporated into the jury instructions for kidnapping in cases going forward.

## IV

We are mindful and sympathetic to the trauma endured by E.F. as the victim of these crimes. However, governing law dictates the decision reached in this case.

The district court erred by admitting hearsay documents into evidence to prove Harper's Indian status. This error was not harmless because, without the admission of this evidence, one jurisdictional element of each crime charged was lacking. We **REVERSE** the convictions and sentence and **REMAND** with instructions to the district court to vacate the judgment and conduct further proceedings consistent with this decision.

25