FILED
United States Court of Appeals
Tenth Circuit

September 5, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LLOYD RAY HATLEY,

    Defendant - Appellant.

No. 23-7046

_____

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:21-CR-00271-CBG-1)**

_____

Jami Johnson, Assistant Federal Public Defender (Jon M. Sands, Federal Public Defender, and Molly A. Karlin, Assistant Federal Public Defender, with her on the briefs), Office of the Federal Public Defender, Phoenix, Arizona for Defendant-Appellant.

Benjamin D. Traster, Assistant United States Attorney, Muskogee, Oklahoma (Christopher J. Wilson, United States Attorney, with him on the briefs), for Plaintiff-Appellee.

_____

Before **McHUGH**, **EID**, and **FEDERICO**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

    Defendant-Appellant Lloyd Ray Hatley was convicted of involuntary

manslaughter in Indian country following a car accident that resulted in the death of

Mary Nappa.  The car accident occurred after Hatley, while driving five miles per hour over the speed limit on a public highway in Oklahoma, glanced at another vehicle parked on the shoulder of the road.  When Hatley looked back at the road, he saw that the vehicle carrying Nappa had swerved into his lane and had begun to brake.  But by the time Hatley saw the brake lights, it was too late—he failed to brake in time and crashed into the car, causing Nappa's death.

Hatley was indicted on four counts related to the car accident.  As relevant to this appeal, one of the counts charged Hatley with involuntary manslaughter occurring in Indian country in violation of 18 U.S.C. §§ 1112, 1151, and 1153.  At trial, the government sought to prove Hatley's Indian status—an essential element required for conviction—through multiple pieces of evidence, including a tribal verification letter and the testimony of Derrick Vann, a tribal employee who served as the Cherokee Nation's records custodian.

On appeal, Hatley challenges his conviction on several grounds.  We begin— and end—with his first argument, which we conclude is dispositive.  Hatley argues that the district court abused its discretion by admitting the evidence offered by the government to prove his Indian status—that is, the tribal verification letter and Vann's testimony.  And those erroneous evidentiary rulings, Hatley claims, require reversal of his conviction because no other competent, admissible evidence provided

proof of his Indian status *on the day of the car accident*—proof that he contends is necessary for the government to establish federal criminal jurisdiction.[1]

We agree. Specifically, we first hold that the government was required to prove Hatley's Indian status at the time of the offense. And we further conclude that the district court abused its discretion by admitting the tribal verification letter and Vann's testimony as proof of Hatley's Indian status. Because the government introduced no other competent, admissible evidence from which the jury could conclude that Hatley was an Indian at the time of the car accident, the district court's erroneous evidentiary rulings were not harmless.

Accordingly, we reverse Hatley's conviction under Count 4 and remand to the district court with instructions to vacate Hatley's conviction and conduct further proceedings consistent with this decision.

## I.

One afternoon in February 2017, Lloyd Ray Hatley was driving his Dodge Ram pickup truck on a state highway outside Ada, Oklahoma, within the Chickasaw Nation Reservation. It was a warm, clear afternoon, and the roads were dry.

Just before 2:00 P.M., however, Hatley's car collided with the rear of a four-door Pontiac Grand Am, driven by Gay Ott and carrying passengers Stephen Ott and

---

[1] Separately, Hatley challenges the validity of Count 4 of the indictment, arguing that the two alternative theories alleged in the indictment are void for vagueness and insufficiently particular, respectively. Hatley also challenges the propriety of the district court's jury instructions for Count 4 on the grounds that the district court failed to adequately instruct the jury as to the required elements of gross negligence and actual knowledge.

Mary Nappa.  Both vehicles had been traveling east on the highway, which was a two-lane highway with a no-passing zone marked by double-solid yellow lines and with no designated left-hand turn lane.  The speed limit was 65 miles per hour.

After the collision, Hatley's Dodge came to rest on the eastbound shoulder, facing southeast.  But the collision caused the Pontiac to fully rotate, ultimately coming to rest on the westbound shoulder of the road, facing west—the opposite direction from which the vehicles had been traveling.  The Pontiac was badly damaged, and all three passengers were "pinned in the vehicle."  R. Vol. III at 199. Emergency responders used the "jaws of life" to cut open and gain access to the vehicle, *id.* at 185, and they were able to extricate Gay and Stephen Ott, who were each transported to a hospital.  But emergency responders were unable to rescue Mary Nappa:  although they removed Nappa from the vehicle, she had already lost a pulse and stopped breathing, and she was pronounced dead at the scene.  Hatley, meanwhile, did not appear to be injured.

Based on data from the vehicle's event data recorders (the "EDR data"), officers concluded that, just before the crash, the Pontiac had slowed down, attempting to make an illegal left turn across the double-yellow lines.  Meanwhile, the Dodge had been accelerating at the time of the crash, with Hatley driving it at 69 miles per hour (approximately 5 miles per hour above the speed limit) just one second before the collision.  Right before the collision, Hatley applied the brake pedal, slowing to a speed of 56 miles per hour on impact.  The EDR data for Hatley's Dodge indicated sharp, evasive steering right as Hatley applied the brake, which—as

4

one officer later testified—suggested that Hatley was "trying to avoid a collision" because "something unexpected . . . had just occurred." *Id.* at 487.

Just before the collision, Hatley had glanced over at another vehicle—a black truck nearly identical to his—that was on the side of the road. Hatley later testified that he had only glanced at the truck for a "split second," and that it was mainly in his peripheral vision. *Id.* at 508. Additionally, although the EDR data for the Pontiac did not reflect whether the brake lights were functional, Hatley testified at trial that he "saw the brake lights of the Pontiac" seconds before the crash, right after he looked back from the truck on the side of the road. *Id.* at 510. But, according to Hatley, the Pontiac had "just swerved into [his] lane" to turn left moments before the collision, which he had not expected because he did not recall seeing a turn signal and because "nobody's ever turned left there . . . and there's no place to turn left to." *Id.* at 504–06.

At the scene, officers spoke briefly with Hatley, later describing his demeanor as "dazed or stunned." *Id.* at 202. After the crash, Hatley was taken to the Chickasaw Nation Medical Center for evaluation, where officers went as well. At the hospital, one officer heard Hatley state that the collision was his fault. That officer also noted that Hatley's demeanor seemed "confused" or "out of it." *Id.* at 382–83.

The government ultimately charged Hatley with four counts: two counts of involuntary manslaughter in Indian country (each concerning Nappa's death, but under two separate theories), in violation of 18 U.S.C. §§ 1112, 1151, and 1153 (Counts 1 and 4); and two counts of driving under the influence resulting in great

bodily injury (one for each of the Otts), in violation of 18 U.S.C. §§ 13, 13(b)(2)(A), 1151, and 1152, and Okla. Stat. tit. 47, § 11-904(B) (Counts 2 and 3).[2]

As relevant here, Count 4—one of the involuntary manslaughter charges and the sole offense of conviction—alleged that Hatley

> unlawfully kill[ed] Mary Nappa, in the commission of an unlawful act not amounting to a felony, that is[,] operating a motor vehicle while failing to devote his full time and attention to driving, and in the commission in an unlawful manner and without due caution and circumspection of a lawful act which might produce death.

R. Vol. I at 223.[3]

During trial, the government offered several pieces of evidence to prove Hatley's Indian status, which was an essential element of each charged offense. First, the government introduced a July 2020 document filed by Hatley in an

---

[2] Counts 1, 2, and 3 arose out of allegations that Hatley had been driving under the influence of marijuana and Xanax, which he admitted to taking the night before the collision. The court dismissed one of those charges (Count 3) on the government's unopposed motion, and the jury acquitted Hatley on the other two charges (Counts 1 and 2). Thus, only Count 4—one of the involuntary manslaughter charges, which was based on a separate theory not involving driving under the influence—is relevant to this appeal. Accordingly, we do not discuss facts and evidence pertaining to Hatley's alleged intoxication, which the jury necessarily rejected and which are irrelevant to the charge for which he was convicted.

[3] Before trial, Hatley filed a motion for a bill of particulars, arguing that the involuntary manslaughter charge in Count 4 did not provide sufficient specificity as to the basis for the underlying predicate act—that is, the "unlawful act" of "operating a motor vehicle while failing to devote his full time and attention to driving." The government subsequently provided a bill of particulars, which specified that the underlying predicate act came from Okla. Stat. tit. 47, § 11-901b.

Hatley also filed a motion to dismiss Count 4 of the indictment, arguing that it was void for vagueness because the underlying predicate act, as defined in the Oklahoma statute, failed to provide fair notice of the prohibited conduct and invited arbitrary and discriminatory enforcement. The district court denied Hatley's motion.

Oklahoma state-court case arising out of the same car accident, which—despite heavy redactions—states that Hatley "is a citizen of the Cherokee Nation."  R. Vol. III at 749–55; *see* Supp. R. Vol. II at 1 (government's Exhibit 51, containing the state-court filing).

Second, the government introduced—over Hatley's objections to lack of foundation and hearsay—an unsigned tribal verification letter, dated March 24, 2021, on letterhead of the "Cherokee Nation, Office of the Attorney General."  R. Vol. III at 222–24; *see* Supp. R. Vol. I at 1 (government's Exhibit 50, containing the verification letter).  The verification letter stated that Hatley "is a registered citizen of the Cherokee Nation as of October 31, 1984."  Supp. R. Vol. I at 1.  The letter also reads, "The response in this letter is based on information exactly as provided by the requesting party.  Any incorrect or incomplete information may invalidate the above determination."  *Id.*

Third, the government produced a witness, Derrick Vann, who was the interim Tribal Registrar for the Cherokee Nation at the time.  Vann testified that he was the "custodial person for all of [the] Cherokee Nation records," which "include[s] information about who's a member of the Cherokee Nation."  R. Vol. III at 220–21.  Over Hatley's objection for lack of foundation, Vann testified that Hatley was a blood member of the Cherokee Nation.  The government asked Vann when Hatley formally enrolled in the tribe, and Vann replied, "I can't recall the day, but I think it was in November of 2013."  *Id.* at 221.  The government then asked Vann to refresh his recollection of Hatley's enrollment by reading the verification letter; after doing

7

so, and over an objection from Hatley, Vann testified that Hatley enrolled as a member of the Cherokee Nation on October 31, 1984. Vann also explained the verification process for membership with the Cherokee Nation and stated that Hatley had submitted the required documentation to become a tribal member, and that Hatley's grandmother was an original member of the tribe. Vann then testified that the verification letter was the "standard document that we give for anyone asking— any legal team asking for citizenship information on a citizen." *Id.* at 223. After that testimony, the district court admitted the verification letter into evidence, again over Hatley's foundation and hearsay objections.

Fourth and finally, Hatley himself later testified on cross-examination that he is a member of the Cherokee Nation with Cherokee blood. But the government did not ask Hatley about the date of his enrollment or whether he was a tribal member on the date of the accident, which had occurred more than five years earlier.

Prior to jury deliberations, Hatley requested a jury instruction for Count 4 stating that, to convict Hatley of involuntary manslaughter, the jury needed to find beyond a reasonable doubt that (among other things) Hatley "caused the death of Mary Nappa by operating a motor vehicle while the defendant failed to devote his full time and attention to driving" and that he "knew his conduct was a threat to the lives of others or it was foreseeable to him that his conduct was a threat to the lives of others." R. Vol. I at 387. Hatley's proposed instruction would have precluded the government's alternative theory that he caused Nappa's death by engaging in "a lawful act in an unlawful manner, or without due caution and circumspection, which

8

act might produce death." *See id.* at 279. The district court rejected Hatley's proposed instruction and instead instructed the jury as follows:

> To find the defendant guilty of this crime you must be convinced that the government proved each of the following beyond a reasonable doubt:
>
> *First:* the defendant caused the death of Mary Nappa, while the defendant was committing one or both of the following acts:
>
> > (a) a violation of Title 47, Oklahoma Statutes, Section 11-901b by failing to devote his full time and attention to driving; or
> >
> > (b) a lawful act in an unlawful manner, or without due caution and circumspection, which act might produce death;
>
> *Second:* the defendant knew that his conduct was a threat to the lives of others or it was foreseeable to him that his conduct was a threat to the lives of others;
>
> *Third:* the killing took place within Indian Country; and
>
> *Fourth:* the defendant is an Indian.
>
> In order to prove this offense, the government need not prove that the defendant specifically intended to cause the death of Mary Nappa. But it must prove more than that the defendant was merely negligent or that he failed to use reasonable care. The government must prove gross negligence amounting to wanton and reckless disregard for human life.

*Id.* at 470–71; *see* R. Vol. III at 593–94.

Ultimately, the jury convicted Hatley of Count 4 and acquitted him on the remaining counts.[4] The district court subsequently sentenced Hatley to 48 months'

---

[4] The jury also made special findings that, at the time Nappa was killed, Hatley was engaged in both "an unlawful act not amounting to a felony, that is operating a motor vehicle while failing to devote his full time and attention to driving" and "a lawful act, in an unlawful manner or without due caution and circumspection, which act might produce death." R. Vol. I at 487–88; *see* R. Vol. III at 635.

imprisonment and three years of supervised release, and it ordered him to pay

approximately $10,000 in restitution.[5]  This appeal followed.

## II.

Before us, Hatley argues that the district court abused its discretion in

admitting two pieces of evidence—the tribal verification letter and the testimony of

Derrick Vann, a tribal employee—that the government offered in order to prove

Hatley's Indian status as required under 18 U.S.C. § 1153.

We review a district court's evidentiary rulings for an abuse of discretion.

*United States v. Silva*, 889 F.3d 704, 709 (10th Cir. 2018).  Under the abuse-of-

discretion standard, "we will not disturb the district court's ruling absent a distinct

showing it was based on a clearly erroneous finding of fact or an erroneous

conclusion of law or manifests a clear error of judgment."  *United States v. Batton*,

602 F.3d 1191, 1196 (10th Cir. 2010) (quotation omitted).  A legal error, however,

"constitutes an abuse of discretion per se."  *United States v. McFadden*, 116 F.4th

1069, 1082 (10th Cir. 2024).

## A.

Because the evidentiary issues in this case turn on the substantive requirements

to prove Indian status under the General Crimes Act, 18 U.S.C. § 1152, and the

---

[5] On appeal, Hatley initially challenged the district court's application of the United States Sentencing Guidelines when calculating his sentence, but he subsequently withdrew that sentencing argument and no longer presses it on appeal. Accordingly, we do not discuss the facts or procedural history related to sentencing.

Major Crimes Act, *id.* § 1153, we begin by discussing those standards and their significance to Hatley's appeal.

The federal government possesses exclusive jurisdiction over the prosecution of certain crimes committed by an Indian in Indian country. *See id.* §§ 1152, 1153; *United States v. Wood*, 109 F.4th 1253, 1257 & n.5 (10th Cir. 2024). Specifically, the General Crimes Act provides that "the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States . . . shall extend to the Indian country," except as otherwise provided by law. 18 U.S.C. § 1152. Section 1152, however, expressly carves out "offenses committed by one Indian against the person or property of another Indian," over which Indian tribes retain exclusive jurisdiction. *Id.*

The General Crimes Act therefore "extends the general criminal laws of federal maritime and enclave jurisdiction to Indian country, except for those 'offenses committed by one Indian against the person or property of another Indian.'" *Negonsott v. Samuels*, 507 U.S. 99, 102 (1993) (quoting Felix Cohen, *Handbook of Federal Indian Law* 288 (1982 ed.)). Meanwhile, as just indicated, the power to punish those "latter offenses"—that is, offenses committed by one Indian against another in Indian country—generally remains part of each tribe's own retained sovereignty and subject to tribal jurisdiction, unless such an offense is "among those enumerated in the Indian Major Crimes Act." *Id.*

The Major Crimes Act, in turn, provides that "[a]ny Indian who commits against the person or property of another Indian or other person" any offense listed in

11

the statute "shall be subject to the same law and penalties as all other persons committing [the same offense], within the exclusive jurisdiction of the United States."  18 U.S.C. § 1153(a).  As relevant here, one such enumerated offense is "manslaughter," *id.*, which itself is a federal crime under 18 U.S.C. § 1112 (and which was the offense Hatley was charged with and convicted of under Count 4 of the indictment).

For the federal government to avail itself of exclusive criminal jurisdiction under § 1153, and to obtain convictions in such a prosecution, the government must prove that the defendant is an Indian.  *Wood*, 109 F.4th at 1257.  Indeed, as we have explained, a defendant's "Indian status is an essential element of offenses charged and not a mere technicality."  *United States v. Harper*, 118 F.4th 1288, 1296 (10th Cir. 2024); *United States v. Prentiss*, 256 F.3d 971, 980 (10th Cir. 2001) (en banc) ("*Prentiss I*"), *overruled in part on other grounds by United States v. Cotton*, 535 U.S. 625 (2002).

Our Court applies "a two-part test for determining whether a person is an Indian for the purpose of establishing federal jurisdiction over crimes in Indian country."  *Wood*, 109 F.4th at 1257 (quoting *United States v. Prentiss*, 273 F.3d 1277, 1280 (10th Cir. 2001) ("*Prentiss II*")).  Under that test, the government must prove that the defendant "(1) has some Indian blood; and (2) is recognized as an Indian by a tribe or by the federal government."  *Prentiss II*, 273 F.3d at 1280 (quotation omitted).  But, as relevant to this appeal, it remains an open question in our Circuit whether the government must prove that a defendant was recognized as

12

an Indian *at the time of the offense*, or whether the government instead may merely prove a defendant's Indian status more generally, without reference to timing.[6]

Although the second prong of the two-part *Prentiss II* test does not mention the timing of a defendant's Indian status or tribal enrollment vis-à-vis the timing of the crime, we have occasionally spoken of the element in such terms. For instance, in *United States v. Wood*, we discussed a jury instruction that required the jury to determine the defendant's Indian status based on whether the defendant had "'some Indian blood' and 'was, *at the time of the offense*, recognized as an Indian by a federally recognized tribe or by the federal government.'" 109 F.4th at 1267 n.15 (emphasis added). We observed, moreover, that the jury instruction was "consistent with [our] holding in *Prentiss II*." *Id.*; *see United States v. Ortner*, 2023 WL 382932, at *3 (10th Cir. Jan. 25, 2023) (unpublished) (discussing identical jury instructions).[7]

---

[6] The government's primary position is that it was not required to prove that Hatley was an Indian at the time of the offense. But the government also claims that Hatley waived any argument to the contrary because he did not object to the district court's jury instructions, which stated that the jury needed to find only that Hatley "is an Indian" generally. *See* R. Vol. I at 470–71, 73. We disagree with the government's waiver argument. Similar to our review of sufficiency-of-the-evidence challenges, we measure the harmfulness of erroneous evidentiary rulings (that is, whether the erroneous ruling affected the defendant's substantial rights) in light of the *legal elements* of the crime, regardless of the elements ultimately listed in the jury instructions. *See United States v. Simpkins*, 90 F.4th 1312, 1316 (10th Cir. 2024). Accordingly, Hatley's failure to object to the instruction requiring the jury to evaluate whether Hatley "is an Indian" in general does not waive his argument that the legal elements of the crime charged in Count 4 required the government to prove Hatley's Indian status at the time of the offense.

[7] Unpublished cases cited in this decision are not binding precedent, but we consider them for their persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

13

Similarly, when discussing § 1153's related requirement that a crime occur in Indian country, we have indicated that the element must be proven as of the time of the offense. *See United States v. Lamy*, 521 F.3d 1257, 1268 (10th Cir. 2008); *United States v. Neha*, 301 F. App'x 811, 815 (10th Cir. 2008) (unpublished) (noting that, in order to prove a crime occurred in Indian country, the government must prove that the location of the crime was considered part of Indian country "at the time of the offense").

Still, neither *Wood* nor any of our other cases definitively answers whether § 1153 requires the government to prove that a defendant was recognized as an Indian at the time of the offense. Indeed, to date, only the Ninth Circuit has squarely decided this question—holding that, in order to establish Indian status, "the government must prove that the defendant was an Indian at the time of the offense with which the defendant is charged." *United States v. Zepeda*, 792 F.3d 1103, 1113 (9th Cir. 2015) (en banc).

Like Hatley's conviction here, *Zepeda* arose out of a defendant's conviction on various counts under § 1153. *See id.* at 1109–10. At trial, the government sought to prove the defendant's Indian status by offering evidence of a tribal enrollment certificate (which listed both the defendant's tribal enrollment status and quantum of Indian blood), along with testimony from a tribal police detective and from the defendant's brother regarding the defendant's Indian status. *Id.* On appeal, the en banc Ninth Circuit—which has otherwise adopted the same test as our Circuit's *Prentiss II* test for determining a defendant's Indian status, *see id.*—held that a

14

prosecution under § 1153 requires the government to prove that the defendant was an Indian as of the date of the offense. *Id.* More specifically, the Ninth Circuit concluded that, to convict a defendant of an offense under § 1153, a jury must find beyond a reasonable doubt that the defendant not only "has some quantum of Indian blood," but also that "the defendant was a member of, or affiliated with, a federally recognized tribe at the time of the offense." *Id.* at 1114.

In reaching that conclusion, the Ninth Circuit observed two problems—each related to the fair-notice function and due-process concerns underlying criminal statutes—that would arise if the government were free to prove Indian status without respect to when the offense occurred. First, the court reasoned that "[i]f the relevant time for determining Indian status were earlier or later, a defendant could not 'predict with certainty' the consequences of his crime at the time he commits it." *Id.* at 1113 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 478 (2000)). "Moreover," the court noted, "the government could never be sure that its jurisdiction, although proper at the time of the crime, would not later vanish because an astute defendant managed to disassociate himself from his tribe." *Id.*

The Ninth Circuit's approach is consistent with how the Supreme Court has historically treated the issue of Indian status in federal criminal prosecutions. For instance, in *United States v. Rogers*, 45 U.S. (4 How.) 567 (1846)—a seminal case from which "[t]he two-part test is derived," *Prentiss II*, 273 F.3d at 1280—the Supreme Court held that a defendant could not establish his Indian status solely through evidence of his adoption into an Indian tribe as an adult. 45 U.S. (4 How.) at

15

573–74.  Importantly, the Court in *Rogers* suggested that the timing of a defendant's Indian status matters:  although it ultimately held that the defendant had not proved his Indian status (because he had not shown that he had Indian blood), the Court nevertheless noted that the defendant, "by becoming a Cherokee by adoption," "may have taken upon himself" certain obligations that otherwise could have changed "his responsibility to the laws of the United States" had he also had Indian blood.  *Id.* at 573.  In that way, *Rogers* indicates that the point at which a defendant enrolls in or formally affiliates himself with an Indian tribe can at least partially determine his criminal liability under the federal enclave statutes.  And elsewhere in *Rogers*, the Court suggested that the defendant's criminal liability ultimately turned on whether the defendant was an Indian "at the time of the commission of the [ ] supposed crime."  *Id.* at 571.

That approach is also consistent with the language and logic of § 1153.  As explained, § 1153 confers exclusive federal criminal jurisdiction over "[a]ny *Indian who commits* against the person or property of another Indian or other person" any of the offenses enumerated in the statute.  18 U.S.C. § 1153(a) (emphasis added).  That statutory language plainly requires that the individual who commits the offense must be an "Indian" within the meaning of the statute (that is, the individual must have Indian blood and be recognized as an Indian), which in turn necessarily suggests that the individual must be an Indian *at the time of the offense*.[8]  After all, if an individual

---

[8] Our reading of this statutory language is bolstered by another provision of the Major Crimes Act, which states that any offense enumerated in the statute "that is not

commits an offense prior to enrolling in, or after disenrolling from, a tribe, then the individual was not an Indian at the relevant time—and so an Indian did not commit the offense.

All of this indicates that, when proving a defendant's Indian status, the government can only satisfy the second prong of the *Prentiss II* test by proving beyond a reasonable doubt that the defendant was recognized as an Indian at the time of the charged offense. Accordingly, here, we reject the government's position that Hatley's "enrollment date was simply not relevant" and that the government "was only required to prove" Hatley's Indian status generally, "without reference to timing." Aple. Br. at 19. We therefore hold that the government was required to prove Hatley's Indian status at the time of the offense—February 22, 2017.

**B.**

Having concluded that the government must prove a defendant's Indian status at the time of the offense, we now discuss some of the different ways the government may properly do so under the Federal Rules of Evidence. One method is to offer a Certificate of Degree of Indian Blood ("CDIB"), which is a card certifying the defendant's quantum of Indian blood and which generally bears a seal from the United States Department of the Interior. *See, e.g.*, *Harper*, 118 F.4th at 1297; *United States v. Walker*, 85 F.4th 973, 981 (10th Cir. 2023). Because they bear "a

---

defined and punished" by a federal enclave statute "shall be defined and punished in accordance with the laws of the State in which such offense was committed *as are in force at the time of such offense*." 18 U.S.C. § 1153(b) (emphasis added).

seal purporting to be that of a department of the United States" and include "a signature purporting to be an execution or attestation," CDIB cards are self-authenticating documents that may be admitted without any additional extrinsic evidence of authenticity under the Federal Rules of Evidence. *Walker*, 85 F.4th at 981 (citation modified) (quoting Fed. R. Evid. 902(1)).

Another method of proving Indian status—and one of the methods used in Hatley's trial—"is to adduce a tribal document containing such information." *Wood*, 109 F.4th at 1257; *United States v. Diaz*, 679 F.3d 1183, 1187 (10th Cir. 2012). Such tribal documents include "a tribe's registration card or document bearing a tribal [rather than federal] seal," or a "letter of membership" issued by the tribe. *Harper*, 118 F.4th at 1296–98. But unlike a CDIB card, a tribal document is not self-authenticating (because it lacks a federal seal), and so the government must "properly authenticate the [document] and establish its admissibility under the Federal Rules of Evidence." *Id.* at 1297; *Wood*, 109 F.4th at 1257–58.

Authentication alone is not enough, however. Tribal documents and records generally constitute hearsay because they consist of out-of-court statements that are "offer[ed] in evidence to prove the truth of the matter asserted" therein—that is, to prove the fact of the defendant's Indian status. Fed. R. Evid. 801(a), (c). Thus, in order to establish a tribal document's admissibility when offered to prove a defendant's Indian status, the government must also demonstrate that the tribal document falls under an exception to the bar on hearsay. *See Harper*, 118 F.4th at 1298.

As our Court has explained, the government generally may do so under Rule 803(6), or the so-called "business records exception" to the rule against hearsay. *Wood*, 109 F.4th at 1258. To satisfy Rule 803(6), the government must demonstrate that the tribal record (1) was "prepared in the normal course of business," (2) was prepared "at or near the time of the events recorded," (3) is "based on the personal knowledge of the entrant or of a person who had a business duty to transmit the information to the entrant," and (4) "indicate[s] the sources, methods and circumstances by which the record was made trustworthy." *Harper*, 118 F.4th at 1297–98 (quotation omitted); Fed. R. Evid. 803(6)(A)–(C). And the government may make each of these showings through, among other things, "the testimony of the custodian or another qualified witness." *Harper*, 118 F.4th at 1298 (quoting Fed. R. Evid. 803(6)(D)).

As Rule 803(6) indicates, any such testifying records custodian or witness must demonstrate personal knowledge of the tribal record's contents (that is, personal knowledge of the defendant's Indian status). The government may prove personal knowledge through a witness's testimony, *see* Fed. R. Evid. 602, and "[t]he foundational requirement for personal knowledge 'is not difficult to meet,'" *Harper*, 118 F.4th at 1299 (quoting *United States v. Duran*, 941 F.3d 435, 448 (10th Cir. 2019)). Still, "[w]hen introducing evidence under Rule 803(6), 'courts generally assume that the business record itself must be introduced, not solely testimony about the contents of a qualifying record.'" *Id.* at 1299 (quoting 30B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6868 (2024)).

Thus, a witness cannot testify *solely* as to the contents or subject matter of a hearsay document—including a business record introduced under Rule 803(6)—in order to prove the truth of the document's contents.  To that end, Federal Rule of Evidence 602 "prevent[s] [a witness] from testifying to the subject matter of the hearsay statement," as opposed to testifying solely to a "hearsay statement as such," when the witness lacks personal knowledge of the underlying subject matter beyond the "making of the statement" itself.  *See* Fed. R. Evid. 602, advisory committee's note (1972).[9]  In that way, Rule 602 precludes a witness who lacks independent personal knowledge of the subject matter of a hearsay document both from authenticating it under Rule 803(6) *and* from testifying as to the document's contents in lieu of introducing the document itself.  *See Harper*, 118 F.4th at 1300.

## C.

With those evidentiary rules in mind, we turn to Hatley's argument.  In short, Hatley argues that the district court abused its discretion in admitting two pieces of evidence related to his Indian status:  (1) the tribal verification letter and (2) Vann's trial testimony as the interim Tribal Registrar for the Cherokee Nation, which was offered both to authenticate the verification letter and to prove its underlying contents.  And because no other admissible evidence demonstrated that Hatley "was

---

[9] Relatedly, although Federal Rule of Evidence 701 permits a lay witness to testify as to opinions formed after personally reviewing hearsay documents (because those opinions are thus "rationally based on the witness's perception"), Rule 701 does *not* permit such a witness to testify as to the truth or substance of the underlying documents.

recognized as an Indian by a tribe or the government *as of the offense date*," Hatley contends, the district court's error was not harmless and thus requires reversal. Aplt. Br. at 33 (emphasis added).

The government does not dispute that the district court abused its discretion in admitting the verification letter in light of our decision in *Harper*, which held that the admission of such a letter is improper where the letter is created for the purpose of litigation and where the testifying records custodian lacks independent personal knowledge of the letter's contents. *See* 118 F.4th at 1300.

Notwithstanding that concession, the government insists that the error in admitting the verification letter was harmless because Vann independently testified as to the information contained in the letter, and because Vann's testimony—the government claims—was itself admissible. We therefore focus our discussion on whether Vann's testimony was admissible.[10]

---

[10] At the outset, we reject the government's argument that Hatley waived any hearsay-based challenge to the admission of Vann's testimony because he only objected to the testimony based on a lack of foundation and personal knowledge. Although Hatley did not raise a hearsay objection specifically as to Vann's testimony itself, he *did* explicitly raise a hearsay objection to the tribal verification document—which supplied the sole basis for Vann's testimony. *See* R. Vol. III at 685. Moreover, because Hatley raised the hearsay objection during Vann's testimony and concomitantly with Hatley's other objections for lack of foundation and personal knowledge, the record as a whole demonstrates that Hatley's objections were sufficient to alert the district court as to both hearsay and foundation issues. *See id.* at 685, 690–91; *see also Harper*, 118 F.4th at 1300 (rejecting government's reliance on a tribal employee's testimony about the contents of a verification letter where the "testimony was derivative of the letter itself, *of which there was a preserved hearsay objection*" (emphasis added)). Accordingly, we conclude that Hatley adequately preserved a hearsay argument.

21

According to the government, Vann's testimony could properly be admitted because it was based on his own personal knowledge as the interim Tribal Registrar for the Cherokee Nation, given that Vann's position made him "the custodial person for all [the] Cherokee Nation records." Aple. Br. at 21. Hatley, meanwhile, argues that Vann's role as the custodial Tribal Registrar was insufficient to establish personal knowledge because he did not personally observe the facts contained within the verification letter—that is, he did not personally prepare the letter or otherwise have a personal acquaintance with Hatley sufficient to give him personal knowledge of Hatley's tribal enrollment. Instead, Hatley contends, Vann's testimony "was based exclusively on his review of tribal records," including the verification letter itself. Aplt. Br. at 32. And Vann's "review of those records" could "not bestow him with 'personal knowledge' of the truth of the facts therein." *Id.*

We agree with Hatley. The facts of this case align closely with those in *Harper*, where the government sought to authenticate a verification letter through the testimony of a custodial employee for the Choctaw Nation, who testified that she had personal knowledge of the facts contained in the verification letter because she routinely prepared and oversaw certificates of enrollment. 118 F.4th at 1294, 1299–300. But *Harper* rejected the government's reliance on that employee's testimony, concluding that the testimony could not establish personal knowledge because it "was derivative of the [verification] letter itself." *Id.* at 1300.

To be sure, there is a distinction between this case and *Harper*: here, unlike the tribal custodial employee's testimony in *Harper*, Vann's testimony was offered

22

both to authenticate the verification letter as a business record *and* to independently prove the truth of the underlying contents in the letter.  In *Harper*, meanwhile, we addressed the tribal employee's testimony primarily insofar as it was offered to establish that the verification letter was a business record.  *See id.*; *cf. id.* at 1294 (noting that the tribal employee testified both as to the verification letter's foundation and authenticity and as to the letter's contents regarding the defendant's tribal enrollment).

But that distinction is immaterial here for two reasons.  First, although *Harper* focused on whether the tribal employee's testimony could properly authenticate the tribal verification letter, our decision suggested that the witness's testimony itself was problematic precisely because it was entirely "derivative of the [verification] letter," such that the witness lacked personal knowledge.  *Id.* at 1300.  Second, as we explained in *Harper*, a custodial employee's testimony about the contents of a verification letter cannot serve as a substitute for the letter itself when the letter is not independently admissible.  *See id.* at 1299; Fed. R. Evid. 602, advisory committee's note (1972) ("[Federal Rule of Evidence 602] . . . prevent[s] [a witness] from testifying to the subject matter of [a] hearsay statement, as he has no personal knowledge of it.").

*Harper* therefore resolves the admissibility question before us.  Vann could not properly testify as to the contents of the tribal verification letter in order to authenticate the document and prove Hatley's Indian status as described within the letter, given that Vann lacked personal knowledge of Hatley's Indian status beyond

23

his review of the letter. Thus, because the district court's admission of both the verification letter and Vann's testimony about the contents of that letter was based on an error of law, the district court abused its discretion in admitting that evidence.

**D.**

Our conclusion that the district court abused its discretion in admitting the verification letter and Vann's testimony about the letter does not end our analysis. Even when a district court abuses its discretion in admitting evidence, we will not reverse if the error is harmless—that is, we will only order a new trial "if the error prejudicially affects a substantial right of a party." *United States v. Keck*, 643 F.3d 789, 795 (10th Cir. 2011) (quotation omitted).

"If a party objects to a district court's [evidentiary] ruling based solely on the Federal Rules of Evidence, we review for non[-]constitutional harmless error." *Walker*, 85 F.4th at 981 (first alteration in original) (quotation omitted). "A non-constitutional error, such as a decision whether to admit or exclude evidence, is considered harmless unless a substantial right of a party is affected." *United States v. Chavez*, 976 F.3d 1178, 1204 (10th Cir. 2020) (internal quotation marks and alterations omitted) (quoting *United States v. Charley*, 189 F.3d 1251, 1270 (10th Cir. 1999)). In this context, "the government bears the burden of demonstrating, by a preponderance of the evidence, that the substantial rights of the defendant were not affected." *Walker*, 85 F.4th at 982 (quotation omitted).

When determining whether an error affected a defendant's substantial rights, "[t]he question [ ] is not whether, setting aside the improperly admitted evidence, the

24

remaining evidence was sufficient to convince a reasonable jury to convict." *Wood*, 109 F.4th at 1265–66. Rather, the salient question is "whether the improperly admitted evidence substantially influenced the outcome of the trial, or whether we are left in grave doubt as to whether it had such an effect." *Id.* at 1266 (quotation omitted); *Chavez*, 976 F.3d at 1204. Still, in evaluating the harmfulness of the error, we may consider whether, in light of the "remaining evidence" at trial, the evidentiary error nevertheless "negates an essential element" of the charged offense, such that the element "was not proved by legal and competent evidence beyond a reasonable doubt." *Harper*, 118 F.4th at 1301; *see also United States v. Blecham*, 657 F.3d 1052, 1067 (10th Cir. 2011) (noting that, in conducting harmless-error review, "[w]e review the record as a whole" and "examin[e] the context, timing, and use of the erroneously admitted evidence at trial and how it compares to properly admitted evidence" (citation modified)).

Here, the government argues that the district court's error in admitting the verification letter and Vann's testimony was harmless because there were two other items of evidence admitted at trial from which a rational jury could find beyond a reasonable doubt that Hatley was an Indian.[11] But "[t]his argument suffers from the

---

[11] The government's harmlessness argument is predicated on the assumption that it only needed to prove Hatley's Indian status in general and that his enrollment date was irrelevant. Our rejection of the government's assumption therefore severely undermines the government's harmlessness argument at the outset. In any event, as we explain below, the government's argument fails as a matter of law even to the extent it asserts that the error was harmless with respect to proof of Hatley's Indian status on the date of the collision at issue here.

very defect identified above:  collapsing the concepts of evidentiary sufficiency and non-constitutional harmlessness." *Wood*, 109 F.4th at 1266.  The government's harmlessness argument therefore would ordinarily "fail[] as a matter of law and operate[] as a waiver of the required [harmless-error] analysis." *Id.*  But "even if [we] were to disregard the government's wholesale waiver of the required analysis and undertake the required [harmless-error] inquiry sua sponte," *id.*, the government's arguments would still fail.  We address each in turn.

First, as the government points out, Hatley himself testified about his Indian status at trial.  On cross-examination by the government, Hatley stated that he is "an Indian" and, more specifically, that he is a "[m]ember of the Cherokee Nation" with "Cherokee blood."  R. Vol. III at 509.  But Hatley did *not* testify as to the date of his tribal enrollment—a fact necessary to establish Hatley's Indian status at the time of the offense.  The government's "extremely limited examination" of Hatley's Indian status during trial thus "gave the jury precious little basis" to evaluate the significance of his testimony.  *Wood*, 109 F.4th at 1266.

Moreover, Hatley's trial testimony occurred more than five years after the car accident occurred, thereby making it unclear whether either Hatley or the government intended for his testimony to describe his Indian status at the time of the *offense* or at the time of *trial*.  Although the government "could have asked the jury during closing arguments to draw [ ] an inference" that Hatley's testimony referred to his Indian status on the date of the car accident, "it completely failed to do so." *Id.*  Lacking that necessary context, Hatley's testimony about his Indian status generally was

26

insufficient to prove, beyond a reasonable doubt, that Hatley was an Indian on the date of the car accident.

Separately, the government also offered into evidence a July 2020 document that Hatley filed in an Oklahoma state-court case arising out of the same accident. The document identified Hatley and stated that he "is a citizen of the Cherokee Nation." R. Vol. III at 754–55; Supp. R. Vol. II (government's Exhibit 51, containing the state-court filing). But the document—which was filed more than three years after the date of the accident—did not specify the date of Hatley's tribal enrollment.

Portions of the record before us indicate that Hatley filed the document and asserted his Indian status in order to dismiss the state-court case pursuant to *McGirt v. Oklahoma*, 591 U.S. 894 (2020). *See* R. Vol. I at 420 (noting that the "state charges against [Hatley] . . . were dismissed pursuant to" *McGirt*). At first blush, that fact might suggest that because Hatley specifically asserted his Indian status— with respect to this same offense—in order to have his state-court case dismissed, then the document would support an inference that Hatley was Indian at the time of the offense. But that is not so. The document, as presented to the jury, was heavily redacted, *see* R. Vol. III at 751–52, such that the jury could not have reasonably inferred why it was filed. Put differently, the redacted version of the document did not provide a sufficient basis for the jury to conclude that it was describing Hatley's Indian status on the date of the accident. The state-court filing was thus likewise insufficient to prove Hatley's Indian status as required for conviction.

27

Finally, we note that certain aspects of Vann's improperly admitted testimony leave us in "grave doubt" as to whether that "improperly admitted evidence substantially influenced the outcome of the trial." *Wood*, 109 F.4th at 1266 (quotation omitted). Specifically, when the government asked Vann when Hatley formally enrolled as a member of the Cherokee Nation, Vann replied, "I can't recall the day, but I think it was in November of 2013." R. Vol. III at 221. Only after refreshing his recollection by reading the (also-inadmissible) tribal verification letter did Vann testify that Hatley enrolled in the tribe on October 31, 1984—nearly thirty years off from his original guess. *See id.* at 222. Vann also suggested that the tribal verification letter was a document prepared specifically for purposes of litigation, testifying that the letter was the "standard document that we give for anyone asking—any legal team asking for citizenship information on a citizen." *Id.* at 223.

All of that testimony not only undermined Vann's personal knowledge of Hatley's Indian status and the government's basis for admitting Vann's testimony and the verification letter, but it also left Vann's credibility substantially "open to question." *Chavez*, 976 F.3d at 1212. We therefore harbor "grave doubt" as to whether Vann's improperly admitted testimony—coupled with the improperly admitted verification letter—"had a substantial influence on the outcome," *id.* (quotation omitted), with respect to proof of Hatley's Indian status at the time of the offense.

Having considered the effect of the district court's evidentiary errors, the government has failed to carry its burden of showing that Hatley's substantial rights

28

were not affected. We therefore hold that the district court's error in admitting other pieces of evidence about Hatley's Indian status was not harmless. Because an "essential element" of the crime "was not proved by legal and competent evidence beyond a reasonable doubt," *Harper*, 118 F.4th at 1301, we reverse Hatley's conviction under Count 4.[12]

### III.

For the foregoing reasons, we REVERSE and REMAND to the district court with instructions to VACATE Hatley's conviction and conduct further proceedings consistent with this decision.

---

[12] Given our disposition of this case on the first issue, we need not address Hatley's other arguments for reversal. *See Harper*, 118 F.4th at 1301.